## AQUA FLAME, INC.

### v.

## IMPERIAL FOUNTAINS, INC., a Division of Meridian Enterprises, Inc.

### No. CA 3-74-1008-C.

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 16, 1979.

Timothy E. Kelley, Dallas, Tex., for plaintiff.

H. Robert Powell, Hughes, Luce, Hennessy, Smith & Castle, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

This is a civil action over a Patent License Agreement for a flaming fountain nozzle. Jurisdiction is based on diversity of citizenship.[1] Plaintiff is a Texas corporation with its principal place of business in Texas. Defendant Imperial Fountains, Inc., is a division of Meridian Enterprises, Inc., a California corporation with its principal place of business in California. The dispute centers mainly on the second paragraph of the agreement which provides for three payments of $5,000 and on three royalty payments of $4,000 minimum provided for in paragraph three. So the requirements of 28 U.S.C. § 1332 as to complete diversity and $10,000 in controversy have been met. The Court therefore concludes that it has subject matter jurisdiction.

### I.

Defendant agrees that it entered into the contract and that it started performance under it. It defends as to Plaintiff's claim on the three payments of $5,000 provided for in paragraph two of the agreement by claiming a failure of consideration. Paragraph two reads:

"2. As a consideration for the granting of such exclusive license for the sales and marketing rights of Flaming Fountains incorporating the subject matter of the said Patent, the Licensee shall pay to the Licensor the sum of Fifteen Thousand Dollars ($15,000.00) United States funds in cash in accordance with the following schedule.

"Five Thousand Dollars ($5,000.00) on September 8, 1973.

Five Thousand Dollars ($5,000.00) on September 8, 1974.

Five Thousand Dollars ($5,000.00) on September 8, 1975."

Defendant contends that Plaintiff does not now and never has owned any interest in the patent that was purported to be licensed. It is elementary that if Plaintiff never has owned the patent, it could never license it so that there would be a complete failure of consideration for Defendants' promise to pay $15,000.[2]

---

1. 28 U.S.C. § 1332.

2. *Penn v. Gulbenkian*, 243 S.W.2d 220 (Tex.Civ. App.—Dallas, 1951; aff'd 151 Tex. 412, 252

The patent that was to be licensed is number 3,565,337 issued by the United States Patent Office to Donald R. Ditto on February 23, 1971. Mr. Ditto and Mr. John R. Sparks are respectively the President and Vice-President of Plaintiff. Aqua Flame, Inc., is at least the third venture by Messrs. Ditto and Sparks to market Mr. Ditto's invention. It was never shown that Mr. Ditto had ever assigned his patent or any portion of it to any other person or entity until April 10, 1972, when he sold, assigned and transferred his whole interest in the patent to the Republic National Bank of Dallas as security for a loan for a venture previous to Aqua Flame, Inc.[3] Mr. Ditto warranted that he was, as of the signing of the security agreement, the sole owner of the patent.[4] The sale, assignment and transfer were subject to a condition

subsequent.[5] The proof at trial was that this condition subsequent never came into being as the Obligation has never been paid. So when Plaintiff and Defendant entered into the Patent Licensing Agreement on September 8, 1972, neither Plaintiff nor Mr. Ditto owned any interest in the patent, Republic Bank did. The Court refuses to speculate as to the difference any other language would have made in the agreement between Mr. Ditto and Republic Bank as it still would not show that this Plaintiff, Aqua Flame, Inc., ever had an interest in this patent that could have been licensed to Defendant or anyone else.

## II.

The second dispute between the Parties centers on paragraph 3 of the licensing agreement which is set out in the margin.[6]

---

S.W.2d 929, 1952); *Henry v. McConnell*, 400 S.W.2d 344 (Tex.Civ.App.—Waco, 1966, n. w. h.).

**3.** 2. In consideration of the sum of $10 and other good and valuable consideration to it in hand paid by Bank, the receipt of which is hereby acknowledged, Mortgagor does sell, assign, and transfer unto Bank, the whole right, title, and interest in and to the improvement described in letters patent described above and in and to the letters patent themselves, and the full and exclusive benefit of the same and all improvements thereon; the same to be held and enjoyed by Bank for its own use, and for the use of its successors and assigns, to the full end of the term for which the letters patent are or may be granted, as fully and entirely as same would be held and enjoyed by the Mortgagor, had these presents not been executed.

**4.** 3. Mortgagor covenants with Bank that the letters patent are valid and subsisting; that the Mortgagor is now the sole owner of the letters patent and all rights under the same; and that it has good right to assign the same; and that the same are free from all encumbrances, except the security interest now held by Bank.

**5.** 4. Provided, that if the Obligation is paid according to the terms of the agreement relating thereto and promissory notes issued and executed evidencing same, then this deed and assignment shall be void and Bank at any time thereafter through request and cost of Mortgagor shall reassign the mortgaged property and premises to the Mortgagor as it shall direct.

**6.** 3. During the life of this Agreement, the Licensee shall pay to the Licensor a royalty in

the amount of four (4%) percent of the gross sales price of all Flaming Fountains or parts thereof which are sold by Licensee which incorporate the subject matter of the Patent. In the event of a lease or rental of Flaming Fountains rather than a sale, the royalty of four (4%) percent shall be paid on the gross rental or revenue received by Licensee or by any agency, corporation, firm or partnership in which Licensee, or any of its officers or stockholders own as much as a ten (10%) percent interest. The royalty shall be paid on a quarterly basis with the quarters extending for a three-months period, with the initial quarter beginning September 8, 1972. The minimum royalty for each year of this License Agreement shall be the sum of Four Thousand Dollars ($4,000.00). So long as Licensee pays to Licensor the royalty, and in case the royalty from the sales does not amount to Four Thousand Dollars ($4,000.00) during any year, and Licensee shall pay to Licensor the royalty plus any difference so as to aggregate the sum of Four Thousand Dollars ($4,000.00) during any year, this License Agreement shall continue in full force and effect during its term or any extended term thereof. The royalty shall be based upon the total sales price of any fountain sold by Licensee or any agency, corporation, firm or partnership in which Licensee, or any of its officers or stockholders own as much as a ten (10%) interest utilizing the invention. The gross sales price shall not include any sales tax paid to any governmental agency nor shall it include freight and customary trade discounts. The payment of the royalty shall be made within fifteen (15) days following the close of each quarter as invoiced when shipped. No royalty payments shall be due or payable on any substitution or replacement parts.

Plaintiff contends that a minimum royalty of $4,000 per year was due to it from Defendant during each of the three years of the initial term of the contract. Defendant contends that no minimum royalty was required by the agreement but that the agreement allowed Defendant to pay a minimum royalty in order to keep its rights to lease or sell the patented device. The only reasonable interpretation of this paragraph is that it mandates a payment by Defendant to Plaintiff of $4,000 per year for the term of the contract as a royalty. This royalty had to be paid no matter how many nor how few flaming fountains Defendant sold or leased.

■ The Court is quite willing to find a lack of consideration for and a fraud in the inducement to the entire contract and this paragraph in particular.[7] Plaintiff has no right to collect a royalty on a patented device of which it owns no interest in the patent.

There is no dispute but that Defendant paid the applicable royalties for the flaming fountains actually sold. So the point of contention is the remainder of the $12,000 of unpaid royalties.

Defendant also defends against Plaintiff's efforts to collect the $12,000 due under this paragraph on the basis of Section 3 of the Clayton Antitrust Act (15 U.S.C. § 14) and Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). Defendant contends that Plaintiff forced Defendant to purchase the patented device along with non-integral components which it contends is a per se illegal tying agreement under these laws.[8]

There is no dispute but that the agreement was negotiated in interstate commerce and that the equipment was sold in interstate commerce. The Court so finds.

There is a dispute as to what is a flaming fountain nozzle, a flaming fountain nozzle

system and a flaming fountain as these various words are used in the contract. But even if the contract is not entirely clear, a letter from Mr. Ditto to a then employee of Defendant, dated July 10, 1972, makes it clear that Plaintiff would only sell Defendant the patented flaming fountain nozzle along with other unpatented components. That letter says in part:

"Our attorneys tell us that as long as we have a proprietary interest in the process rather than a particular nozzle that it would be most beneficial to us to sell the Aqua Flame as a complete systems [sic] or complete unit. . . . "

There was abundant evidence presented at trial that the other components sold besides the patented nozzles, unpatented water pumps, electric transformers and electric timers, were off the shelf standard items of other manufacturers. Indeed, these components were exhibited to the Court and it is apparent that they are separate, non-integrated components. Also, Plaintiff sold them to Defendant at considerable mark-ups, 30% to 100%.

■ The inescapable conclusion from this evidence is that Plaintiff used its monopoly power derived from the patent[9] to coerce Defendant into buying unpatented, off-the-shelf mark-uped items. This is per se illegal under the Clayton Act.

To show per se illegality under the Sherman Act, Defendant must show that a not insubstantial amount of trade would be restrained by the illegal tying agreement.

At the $4,000 in royalties level, Defendant would have to sell $100,000 worth of flaming fountains per year as royalties were to be paid at the rate of 4%. The President of Defendant Meridian Enterprises, Inc., Mr. Charles H. Nevil, testified without significant rebuttal that Defendant

7. *Henry,* supra.

8. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *United States v. Loew's Incorporated,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

9. For this discussion, it makes no real difference that Plaintiff did not own the patent. It did represent to Defendant that it did.

would have had to sell 75 to 100 systems per year to attain $100,000 in sales per year. At the minimum price of $330 per system that Defendant was paying to Plaintiff, a minimum amount of approximately $75,000 was to be paid by Defendant to Plaintiff for systems during the initial three-year term of the contract.[10] This is a not insubstantial amount of commerce in light of the cases [11] and the unavailability of the patented flaming fountain nozzle from any other source. This agreement states that it grants an exclusive license so it covers the entire potential market for such flaming fountains.

█ Such tying agreements also constitute misuse of the patent and misuse is a sufficient defense to a suit for unpaid royalties.[12]

Defendant has demonstrated that it has abundant defenses to Plaintiff's claim for royalties.

### III.

In conclusion, Defendant has defended successfully against Plaintiff's claims and the Court will therefore enter judgment in Defendant's favor.

---

**10.** The arithmetic is $330 per unit (minimum) times 75 units per year (minimum) times 3 years equal the sum of $74,250.

**11.** *Loew's,* supra; *Moore v. Matthews,* 550 F.2d 1207 (9th Cir., 1977); *Aamco v. Tayloe,* 407 F.Supp. 430 (E.D.Penn., 1976); *Anderson v. Home Style Stores,* 58 F.R.D. 125 (E.D.Penn., 1972).

**12.** *Morton Salt Co. v. S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363, 1942; *Columbus Automotive Corporation v. Oldberg Manufacturing Company,* 387 F.2d 643 (10 Cir., 1968).