**AAMCO AUTOMATIC TRANSMISSIONS, INC.**

v.

**Harry M. TAYLOE et al.**

**Gordon G. PARO et al.**

v.

**AAMCO AUTOMATIC TRANSMISSIONS, INC.**

**Civ. A. Nos. 73–391 and 73–1615.**

United States District Court, E. D. Pennsylvania.

Jan. 7, 1976.

Jeffrey D. Millaway, Bridgeport, Pa., for Aamco.

Oliver C. Biddle, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Tayloe & Paro.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

Pending are cross motions for summary judgment. The primary issue is whether the record establishes a tying arrangement violative of antitrust law. Aamco Automatic Transmissions, Inc. (Aamco) instituted action against Harry M. Tayloe and other defendants[1] complaining that Tayloe had conspired to breach and breached his franchise contract. In response, Tayloe filed a class action counterclaim alleging that Aamco violated § 1 of the Sherman Antitrust Act[2] by tying the purchase of equipment and repair parts to the purchase of the franchise. Tayloe's class action counterclaim was consolidated with a similar claim brought by Gordon G. Paro, another former Aamco franchisee. The class[3] consists of former Aamco franchisees who occupied that status at any time from October 18, 1968 to October 18,

---

1. Additional defendants were Jimran Corporation, Crossroads Transmissions, Inc., and Edward R. Valencia. The motion of Jimran and Crossroads to dismiss the complaint against them for lack of personal jurisdiction was granted. 67 F.R.D. 440 (E.D.Pa.1975).

2. 15 U.S.C. § 1 (1973).

3. Pursuant to an order dated April 18, 1975, a class action was certified. 67 F.R.D. 440 (E.D. Pa.1975).

1972,[4] and who executed franchise agreements similar to that of Tayloe and Paro with regard to the purchase of initial equipment and/or repair parts from Aamco.

Aamco has moved for summary judgment; a cross motion has been filed on behalf of the class for summary judgment on the issue of liability. Essentially, Tayloe and Paro claim that the provisions in the franchise agreement which require the franchisee to purchase initial equipment and supplies for the opening of an Aamco franchised shop from Aamco and to purchase (with certain exceptions[5]) repair parts from Aamco constitute a tying arrangement that is a per se violation of § 1 of the Sherman Act. Aamco argues that the franchise provisions are not a tying arrangement and, in any event, were modified or waived by the parties' course of performance. Defendant also contends that the claims regarding initial equipment purchases are barred by the statute of limitations, that summary judgment should be granted against those members of the class who have executed releases in favor of Aamco, and that the class has failed to show any injury. Summary judgment will be granted in favor of the plaintiff class as herein modified on the issue of liability.

■ The class will be re-defined, whereby those franchisees who have executed general releases in favor of Aamco will be eliminated from the class. *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 895 (3d Cir. 1975), makes clear that a franchisee's general release to the franchisor operates as a release and bar

to all antitrust claims, whether known or unknown. Although plaintiff asserts that the releases are invalid, the contention is not supported factually or legally on the record.

The class as originally defined would have included those franchisees who executed general releases. On an individual basis, Aamco could have asserted the general releases as a complete defense, shifting the burden to plaintiff to establish the invalidity of such releases on an individual basis. Because these would be separate factual issues as to each franchisee who had executed a general release, class treatment as to such franchisees would seem inappropriate.

As to those franchisees who have executed general releases, summary judgment in favor of Aamco might be appropriate. I have decided, however, to re-define the class so that franchisees who may have executed general releases will not be precluded, as individual franchisees, from bringing action and contesting the validity of the release. The class will henceforth consist of only those former Aamco franchisees who otherwise meet the class requirements and who have not executed a general release in favor of Aamco prior to the filing of this action.

■ While summary judgment is not favored in antitrust litigation due to the usual complexity of factual issues, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), it is clearly appropriate if the movant satisfies the requirements of Rule 56 of the Federal Rules of Civil Procedure[6] and establishes a per se vio-

---

4. October 18, 1968 is the cut-off date for the applicable four year statute of limitations. 15 U.S.C. § 15b (1973). October 18, 1972 is the date on which a consent order was issued by the FTC directing Aamco to eliminate the franchise provisions in question from its franchise agreements. *In the Matter of Aamco Automatic Transmissions, Inc.*, 81 F.T.C. 618 (1972).

5. Exhibits C, D, E and H permit a franchisee to purchase "original equipment manufactured" parts if a needed part is out of stock

and to use certain "hard" parts from used transmissions for the repair of other transmissions.

6. Fed.R.Civ.P. 56(c) provides, in pertinent part: The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

lation of the antitrust laws. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Id.* at 5–7, 78 S.Ct. at 518. Such agreements are considered pernicious for two reasons. First, the buyer is restricted in his choice of suppliers and products. Second, competitors of the supplier of the tied product have potential outlets foreclosed. Thus, a free and openly competitive market is restricted from its normal economic operation.

The prohibition of tying agreements originated in patent cases where it was held that one cannot tie the use of a patented item to unpatented items and thus extend monopoly protection beyond that afforded by the patent. *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917). The principle has evolved in antitrust law to forbid the use of one's dominance in the market of one product to increase one's share of the market of a second product. *International Business Machines Corp. v. United States*, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936). In *International Salt Co., Inc. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), the Court, affirming summary judgment for the government, held it unlawful per se to foreclose competitors by a tying arrangement from any substantial market. The tying arrangement was thus placed in the same category as price fixing [7]—that is, a per se violation of § 1 of the Sherman Act.

■ In order to come within the purview of a proscribed tying arrangement, it must first be established that

there are two separate items involved, the tying product and the tied product. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). In *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), the tying item was the Chicken Delight trademark. The tied items were cookers and fryers, mixes to coat the chicken, and packaging items which the franchisees were required to purchase. Similarly, a franchised trademark was considered to be a distinct item from repair parts in *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.*, 463 F.2d 1002 (5th Cir.), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972). A trademark, then, can be a tying item separate and distinct from items to be used in the operation of the trademarked franchise. In the instant case the requirement of two separate items is met. The Aamco trademark is the tying item.[8] Initial equipment, supplies, and repair parts which must, according to the terms of the franchise agreement, be purchased from Aamco are the tied items.

■ Not only must there be two separate items, but the sale of one (the tying product) must be conditional on the sale of the other (the tied product). Aamco argues that this aspect of a tying arrangement does not exist on the facts of this case because the class has not demonstrated the exercise of coercion by Aamco. Contrary to Aamco's assertion, coercion, as such, is not a prerequisite to liability. Rather, to the extent that there is an element of coercion in a tie-in situation, it is found in two other necessary aspects of a tie. The first is the sale on condition that the franchisee purchase other items. The second is the economic power of the seller which enables him to impose the tie. *See Fortner*

---

7. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

8. *But see Kugler v. Aamco Automatic Transmissions, Inc.*, 460 F.2d 1214 (8th Cir. 1972),

where advertising materials were held not to be a product separate from the Aamco trademark.

*Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

The Supreme Court has clearly held in tying cases that there must be a sale on condition. If the condition is present, the buyer is forced to accept the tied product and forced to forego a substitute. *Northern Pacific, supra* 356 U.S. at 5–6, 78 S.Ct. 514. To the extent that coercion must be shown, it means that the condition is present. A "gun at the head" type coercion is not necessary. The cases cited in Aamco's brief for the proposition that coercion must exist are inapposite. For example, in *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658 (2d Cir. 1974), a licensee of a white collar employment service sued the licensor claiming that a purported requirement that the plaintiff operate a blue collar service under the defendant's trademark was an illegal tie-in. The court, rejecting the presumption that the requisite economic power exists in every trademark, concluded that the contract in question did not require the plaintiff to enter the blue collar business—it only gave him the option. *Id.* at 665.

█ *American Mfrs. Mut. Ins. Co. v. American B.–P. Theatres, Inc.*, 446 F.2d 1131 (2d Cir. 1971), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972), involved a complaint by a sponsor against a television network that in contracting to sponsor a news broadcast, the plaintiff was required to sponsor broadcasts over unwanted stations. The court decided that the plaintiff agreed to accept the local stations as part of its bargaining strategy rather than as a result of any coercion by the network. I read *American Mfrs.* as saying that no conditional sale was established. The court there stated:

> To adopt [the plaintiff's] position would subject businesses to threats of antitrust sanctions whenever they tried by bravado to buttress a sagging market position by initially offering small quantities of desired goods at high prices, in hopes of eliciting a large order without further negotia-

tion. Such bartering ploys are not generally the concern of antitrust laws.

*Id.* at 1137.

Thus, the situation in *American Mfrs.* is a far cry from that presented in the case at bar. The requirement in the Aamco franchise agreements that initial equipment and repair parts be purchased from Aamco was not a bargaining ploy. Indeed, it was not the subject of bargaining between Aamco and a prospective franchisee, but a standard provision in printed contracts prepared and periodically revised by Aamco. The requisite condition appears on the face of the contract. A franchisee was required to agree to purchase certain equipment and repair parts from Aamco when he or she purchased the right to use the Aamco trademark.

█ Once it is established that there are two products of which the sale of one is conditional on the sale of the other, one must proceed to examine the standards for per se illegality of a tying arrangement as set forth in *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). There, the plaintiff charged the defendant with tying the purchase of prefabricated houses to loans for the purchase and development of certain land. Reversing summary judgment for the defendant and entering summary judgment for plaintiff, the Court enunciated the standards for per se illegality and further stated that where those standards are satisfied, summary judgment in favor of the plaintiff is the proper disposition. The two prerequisites are: (1) sufficient market power over the tying product; and (2) a not insubstantial amount of commerce involved.

█ Examining these standards in reverse order, I find that more than an insubstantial amount of commerce is affected in the instant case.

The requirement that a "not insubstantial" amount of commerce be involved makes no reference to the scope

of any particular market or to the share of that market foreclosed by the tie, . . . . [N]ormally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis,* is foreclosed to competitors by the tie . . .

*Id.* at 501, 89 S.Ct. at 1257. In *Fortner Enterprises,* the court stated that $190,-000 was not insubstantial but, in any event, "the relevant figure is the total volume of sales tied by the sales policy under challenge . . . ." *Id.* at 502, 89 S.Ct. at 1258. Evidence submitted by Aamco shows that Harry Tayloe purchased almost $50,000 worth of repair parts from Aamco in the fiscal years 1969 through 1972.[9] That amount must be multiplied many times over to approximate the dollar value of repair parts purchased from Aamco by other class members.[10] While there can be no doubt that the volume of commerce involved here is far in excess of $50,000 and is substantial, even the $50,000 purchased by Tayloe cannot be considered insignificant in *Fortner Enterprises* terms.

The requirement of sufficient market power over the tying product is not a difficult one to meet. "[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 11, 78 S.Ct. 514, 521, 2 L.Ed.2d 545 (1958).

In *Fortner Enterprises* the Supreme Court stated that dominance in the market for the tying product is not necessary and reiterated that "the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." 394 U.S. at 503, 89 S.Ct. at 1258, quoting *United States v. Loews, Inc.,* 371 U.S. at 45, 83 S.Ct. 97. The Court went on to further dilute the extent of economic power which must be shown.

> Market power is therefore a source of serious concern . . . regardless of whether the seller has the greatest economic power possible or merely some lesser degree of appreciable economic power. In both instances, despite the freedom of some or many buyers from the seller's power, other buyers—whether few or many, whether scattered throughout the market or part of some group within the market—can be forced to accept the higher price because of their stronger preferences for the product, and the seller could therefore choose instead to force them to accept a tying arrangement that would prevent free competition for their patronage in the market for the tied product. Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.

*Id.* 394 U.S. at 503–04, 89 S.Ct. at 1259. Essentially, the court seems to be saying that if one has imposed a tie, one had sufficient economic power to do so. In any event, the requisite power is presumed to exist where the tying product is patented or copyrighted. *United States v. Loews, Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). This presumption has been extended to trademarks by the Ninth and Fifth Circuits. *Siegel v. Chicken Delight,* 448 F.2d 43 (9th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972). Such an ap-

---

9. Tayloe's initial equipment and supplies were purchased prior to September 1, 1969.

10. An affidavit submitted by Aamco indicates that there were potentially 389 members of the class, as originally defined.

proach, however, has been rejected by the Second Circuit. *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658 (2d Cir. 1974); *Susser v. Carvel Corp.*, 332 F.2d 505 (2d Cir. 1964), *cert. dismissed as improvidently granted*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). It is not necessary to decide whether there is a presumption of sufficient economic power in every trademark because the requisite economic power is shown to exist as to the Aamco trademark. The very fact that Aamco imposed a tie on its many franchisees evidences the power to have done so and thus apparently meets the standard enunciated in *Fortner Enterprises*. Additionally, although not all trademarks or trademarked items are necessarily unique or as difficult to obtain as patented items or copyrighted works, the reasoning underlying *Loews* is applicable to the Aamco trademark. Aamco is a nationwide business whose name is well known in the field of automobile transmissions. The principles of *Loews* were followed in *Seligson v. Plum Tree, Inc.*, 361 F.Supp. 748 (E.D.Pa.1973), where sufficient economic power to restrain competition was found in the registered trademark "Plum Tree" which had only 46 franchises. The Aamco trademark is carried by over 500 franchisees. Where the owner of a well known and uniquely desirable trademark imposes a tie on its franchisees, the element of economic power required by *Fortner Enterprises* is met.

It is argued by Aamco that the provisions of the contract which require the purchase of initial equipment and repair parts from Aamco were modified or waived by the parties' course of performance because the franchisees actually purchased parts from suppliers other than Aamco. Only brief consideration need be given to this contention which is but a variation of an argument made by the defendant in *Northern Pacific, supra.*

The defendant contends that its "preferential routing" clauses are subject to so many exceptions and have been administered so leniently that they do not significantly restrain competition.

. . . Of course if these restrictive provisions are merely harmless sieves with no tendency to restrain competition, as the defendant's argument seems to imply, it is hard to understand why it has expended so much effort in obtaining them in vast numbers and upholding their validity, or how they are of any benefit to anyone, even the defendant. But however that may be, the essential fact remains that these agreements are binding obligations held over the heads of vendees which deny defendant's competitors access to the fenced-off market on the same terms as the defendant.

356 U.S. at 11–12, 78 S.Ct. at 521.

In support of the argument that non-enforcement of the restrictive provisions constitutes a modification or waiver, Aamco cites one case which it claims is "directly on point." In *Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383 (8th Cir. 1969), an oil company which had contracted to supply oil to a competitor sought a declaratory judgment that the contract called for price-fixing, a per se antitrust violation. The court found that the contract clause in question, part of a formula to calculate the defendant's price to the plaintiff was ambiguous. Having made that determination, the court went on to interpret the language, taking into account the operation of the contract and concluded that both parties intended to allow the defendant to resell the oil at any price. *Id.* at 388. *Sun Oil* has no applicability to the case at bar because, to quote Aamco's brief, "[i]nterpretation of ambiguous terms is not an issue here." The contract terms in question are completely clear on their face.

The franchise agreements themselves provide that they cannot be changed or modified except in a writing signed by Aamco, and, most significantly, that any failure by Aamco to enforce any of the terms or conditions of the agreement shall not be deemed a waiver by Aamco or prevent the enforcement of strict compliance at any time. The fact that

Aamco may not have strictly enforced the tie-in provisions does not constitute a modification or waiver where, as here, these terms are unambiguous on their face. Such a conclusion would be totally inconsistent with the express terms of the contract.

 The behavior of the parties subsequent to the agreement is not an issue when a per se violation is under consideration.

It is the "contract, combination . . or conspiracy in restraint of trade or commerce" which § 1 of the [Sherman] Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other.

*United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 225 fn. 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129 (1940). Therefore, where the contract provisions, as here, constitute a tying arrangement which satisfies the requirements of per se antitrust illegality liability is established. In making certain acts per se violations, the Supreme Court has not only obviated the necessity of proving that the restraints were unreasonable in effect, but also precluded the purported violator from showing that the alleged violations were reasonable in operation.

 Aamco contends that many of the claims of the class are barred by the four year statute of limitations, particularly those relating to the purchase of initial equipment. The cause of action accrues when the act which causes injury is committed but where there is a continuing violation of the antitrust laws, a cause of action accrues each time an injurious act is committed. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). It is clear that damages sustained prior to the four year statutory period are not recoverable. *Id.* at 338, 91 S.Ct. 795. Aamco has submitted by affidavit that approximately 243 class members fully paid for all of their initial equipment before October 18, 1968. Damages for purchases occurring prior

to the statutory period of limitations will not be recoverable. The amount of damages to which the plaintiff class is entitled is a matter of proof to be hereafter determined.